**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

BRIAN L. WYLIE,

       Plaintiff,

v.                                   Case No. 05-CV-71945-DT

KEITH OVERBY and M.J. HOUCK, in their
Individual Capacities,

       Defendants.

_____/

**ORDER GRANTING DEFENDANTS' "MOTION TO DISMISS
OR FOR SUMMARY JUDGMENT"**

Pending before the court, in this case that alleges excessive force in the course

of an arrest, is a "Motion to Dismiss or for Summary Judgment" filed by Defendants

Keith Overby and M.J. Houck. The motion has been fully briefed and the court

conducted a hearing in this matter on March 1, 2006.  For the reasons stated below, the

court will grant Defendants' motion.

**I.  BACKGROUND**

On the evening of November 5, 2004, Plaintiff Brian Wylie, Aaron Gilford, and

Windy Marion visited various bars, drinking in celebration of Plaintiff's upcoming move

to Florida.  (Pl.'s Dep. at 37.)  After spending the evening together, they traveled to

9214 Eagle Hill Road in Clarkston, Michigan, the residence of Marion's boyfriend,

Shannon Inscho, about midnight.  Upon their arrival, Plaintiff and Inscho got into an

argument after Plaintiff asked Inscho to pay him money owed for some work that

Plaintiff had done on a construction project.  (*Id*. at 35, 39.)  When Inscho refused to pay

Plaintiff the money he claimed Inscho owed him, Plaintiff removed what he thought were his tools and equipment from Inscho and Marion's vehicles that were parked in the driveway.  (Pl.'s Dep. at 36; Pl.'s Resp. at Ex. C, Pl.'s Witness Statement.)  Plaintiff later admitted that he mistakenly took some of Inscho's tools while retrieving his own.  (Pl.'s Dep. at 65.)  Plaintiff then left with Gilford and spent the night at another location.  (*Id*. at 20-21.)

The next morning, Inscho noticed that some of his tools were missing and called the police.  (Inscho Dep. at 15.)  Defendant Officer Overby was initially dispatched to the address at 8:30 a.m. pursuant to a complaint that Plaintiff had stolen construction equipment from vehicles belonging to Inscho and Marion.  (Pl.'s Resp. at Ex. D, Incident/Prosecution Report #116843; Inscho Dep. at 13.)  Inscho informed Defendant Overby that Plaintiff had been living at the residence and that he asked Plaintiff to leave after they got into an argument.[1]  (Defs.' Mot. at Ex. F, Incident/Prosecution Report #116902.)  Defendant Overby testified that before arriving at the scene he had been informed that Plaintiff had misdemeanor warrants out of Waterford and Oakland County.[2]  (Overby Dep. at 25.)

At about 11:00 a.m. that morning, Plaintiff went back to 9214 Eagle Hill Road to return Inscho's tools and retrieve his suitcase from the house.  (Pl.'s Dep. at 39; Inscho Dep. at 18.)  Plaintiff knocked or kicked on the door of the residence and although

---

[1]Plaintiff had been living at 9214 Eagle Hill Road for at least a few months prior to the incident.  (Inscho Dep. at 10-11.)

[2]Plaintiff asserts that his outstanding warrants were for nonviolent offenses, violation of probation in a drunk driving case and a failure to pay child support.  (Pl.'s Resp. at 2.)

2

Inscho was inside the house, he did not answer the door and instead called the police. (Inscho Dep. at 18-19.) Plaintiff then went back to Gilford's vehicle and called Marion on her cell phone. (*Id*.) Defendant Officer M.J. Houck arrived on the scene in response to Inscho's call.

Defendant Houck identified Plaintiff and Gilford and asked Plaintiff to sit in the back of the Chevy Tahoe police vehicle and make a written statement describing the events that had transpired. (Houck Dep. at 9-11.) Defendant Houck also told Plaintiff to put his cigarette out and told him that he could not smoke in the police vehicle. (*Id*. at 11.) Plaintiff then put the cigarette out and got in the car. (*Id*.) Defendant Houck closed the Tahoe's rear door and proceeded with his investigation. (*Id*. at 10; Defs.' Mot. at Ex. F, Incident/Prosecution Report #116902.) Plaintiff was not placed under arrest or handcuffed at that time. (Defs.' Mot. at Ex. F, Incident/Prosecution Report #116902)

Defendant Overby arrived on the scene shortly thereafter and asked Plaintiff if he wanted to give his side of the "stolen tools" story. (Defs.' Mot. at Ex. F, Incident/Prosecution Report #116902.) Defendant Overby told Plaintiff that he was not under arrest. (*Id*.) Overby noticed that Plaintiff had an unlit cigarette in his mouth and instructed him not to light the cigarette in the police vehicle. (Pl.'s Dep. at 46; Defs.' Mot. at Ex. F, Incident/Prosecution Report #116902; Overby Dep. at 29.) Defendant Overby than began to interview another witness at the scene. (Defs.' Mot. at Ex. F, Police Report #116902.)

Defendant Overby then returned to the police vehicle to assess Plaintiff's progress in formulating his written statement. (Overby Dep. at 29.) Defendant Overby observed Plaintiff smoking a cigarette and told him to put it out. (*Id*.) Plaintiff says he

3

took one more puff of the cigarette and then threw it on the ground outside the vehicle. (Pl.'s Dep. at 46.)[3]  Plaintiff alleges that Defendant Overby then reached inside the vehicle and grabbed him by his shirt, whereupon Plaintiff "slid past" Defendant Overby, trying to break free from his grasp in order to leave the area and avoid being taken to jail. (Pl.'s Dep. at 46-47.)  Defendant Houck then ran to assist Defendant Overby. (Defs.' Mot. at Ex. F, Police Report #116902.)

After leaving the police vehicle, Plaintiff says that he took three or four steps before he decided to stop.  (Pl.'s Dep. at 46.)  Plaintiff claims that Defendant Overby was still holding his shirt.  (Id.)  When Plaintiff stopped, he turned toward Defendant Overby, and started to raise his hands to shoulder height, with his palms facing out, in what Plaintiff claims was a position of surrender.[4]  (Pl.'s Dep. at 46, 54, 73.)  At this point, Plaintiff claims that he heard one of the Defendants say "tase his ass," and Defendants hit him with Tasers in the rib cage, right temple, and on the top of his skull. (Pl.'s Dep. at 46, 59, 72-76; Pl.'s Resp. at Ex. H, Police Photographs.)[5]  Defendant

---

[3]Defendants contend that Plaintiff blew smoke in Defendant Overby's face and stated "You are going to take me to jail anyway on the warrants."  (Defs.' Mot. at Ex. F, Police Report #116902 .)  They aver that Plaintiff then inhaled again on the cigarette and as Defendant Overby informed Plaintiff that he was under arrest, blew smoke in Defendant Overby's face, and, using his body, aggressively pushed Defendant Overby out of the way.  (Id.; Overby Dep. at 31-33.)

[4]In one portion of his deposition, Plaintiff testifies that he "started" to raise his hands, see Pl.'s Dep. at 46, and at another point he testifies that his hands were "just about shoulder height" when he was tased.  (See Pl.'s Dep. at 54.)  Inscho, Defendant Overby, and Defendant Houck testified that Plaintiff did not put his hands up in this position.  (Inscho Dep. at 29; Overby Dep. at 39; Houck Dep. at 24.)

[5]Defendants contend that Defendant Overby yelled out "Taser, Taser, Taser." (Overby Dep. at 36-37.)  Then, Defendant Overby aimed his Taser at Plaintiff's center body mass while Plaintiff faced him as he was running away from him, and the Taser hit

Overby testified that Plaintiff was facing him when he shot Plaintiff with the Taser. (Overby Dep. at 38.)  Throughout this incident, Plaintiff now contends that he did not make an attempt to threaten or attack either Defendant.[6]  (Pl.'s Dep. at 70-71.)  In addition, Plaintiff claims that neither Defendant instructed Plaintiff to stop nor warned Plaintiff that they would employ the use of Tasers if Plaintiff failed to comply.  (*Id*.) Defendant Houck testified that both Defendants were holding Plaintiff when they fired their Tasers and Defendant Overby testified that he thought he "remember[ed] a sweater being pulled out from [Plaintiff's] right side."  (Houck Dep. at 22; Overby Dep. at 41.)

   After Plaintiff was hit by Defendants' Taser darts, he fell to the ground and was handcuffed.  (Defs.' Mot. at Ex. F, Incident/Prosecution Report #116902.)  Plaintiff was then transported to the hospital to have the darts removed.  (*Id*.)  At the hospital, a neurosurgeon examined Plaintiff and determined that his two options were to pull the prongs out of his skull which would leave metal shards in his head or remove the prongs surgically by cutting out a small portion of his skull and replacing it with a metal plate. Plaintiff decided to have the prongs pulled out.  Plaintiff claims that, as a result of this incident, he suffers from headaches, sensitivity to light, and has trouble reading for long periods of time due to blurred vision.  (Pl.'s Dep. at 29-31.)

_____

near his chest and stomach area.  (*Id*. at 38.)  Defendant Houck testified that he did not know that Defendant Overby was going to use his Taser and had already started squeezing his Taser trigger when he noticed there were two laser dots on Plaintiff's side.  (Houck Dep. at 16.)

   [6]On February 2, 2005, Plaintiff pled guilty to assaulting and resisting a police officer and two counts of breaking and entering into a vehicle.  (Def.'s Mot. at Ex. C, Judgment of Sentence.)

On May 17, 2005, Plaintiff filed a complaint against Defendants Overby and Houck and also against Oakland County alleging 4th Amendment violations "under both the United States Constitution and 42 U.S.C. § 1983" and Assault and Battery.  On November 22, 2005, the parties orally stipulated to the dismissal of Oakland County, and an order was entered to that effect on November 23, 2005.  On November 30, 2005, Defendants Overby and Houck filed the motion presently before the court.

## II.  STANDARD

Rule 56 of the Federal Rules of Civil Procedure, which governs summary judgment motions, provides in part that:

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).  The moving party has the burden of demonstrating that there is no genuine issue as to any material fact, and summary judgment is to be entered if the evidence is such that a reasonable jury could find only for the moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Mt. Lebanon Per. Care Home, Inc. v. Hoover Univ., Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).  It is not necessary for the moving party to support its motion with affidavits or other similar forms of evidence; rather, the movant need only show that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

The moving party may meet his initial burden by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support

6

an essential element of his case. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). If the moving party meets this initial burden, the non-moving party must then present admissible evidence establishing a genuine material issue of fact. *Id.* The non-moving party cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative [admissible] evidence in order to defeat a properly supported motion for summary judgment." *Id.*

The party who bears the burden of proof must present evidence establishing a jury question as to each element of his claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to present sufficient evidence on an essential element of a claim renders all other facts immaterial for purposes of summary judgment. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). Although the non-moving party is entitled to a review of the evidence in the light most favorable to him, he is required to do more than simply show that there is some "metaphysical doubt as to the material facts." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994) (quoting *Matsushita Elec. Ind. Co.*, 475 U.S. at 586)).

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 250. Therefore, the court must necessarily examine the evidence provided in a light that is most favorable to the non-moving party, *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), and decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," *Anderson*, 477 U.S. at 251-252.

### III. DISCUSSION

7

### A.  Qualified Immunity for Claim of Excessive Force

Generally, public officials performing discretionary functions are entitled to qualified immunity and are protected from defending a § 1983 action when their conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Whether qualified immunity attaches to an officer's conduct is a legal question, to be determined by the judge prior to trial, assuming that the question does not depend upon a jury determination of contested material facts. *Walton v. City of Southfield*, 995 F.2d 1331, 1335 (6th Cir. 1993).  Qualified immunity, when applicable, is not simply a defense to liability in the underlying case, but it provides immunity from suit altogether, shielding officials from the burdens of discovery and costs of trial. *Comstock v. McCrary*, 273 F.3d 693, 702 (2001) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

The Sixth Circuit evaluates qualified immunity claims using a three-part inquiry. *Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003); *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999).  First, the court must determine whether the plaintiff has alleged facts which, taken in a light most favorable to him, show that the defendant-official's conduct violated a constitutionally protected right.  *Toms*, 338 F.3d at 524.  Second, but only if the first inquiry is answered in the affirmative, the court determines whether the right that was violated was clearly established such that a reasonable official, at the time the act was committed, would have understood that his conduct violated that right.  *Id.; Comstock*, 273 F.3d at 702 (citing *Saucier v. Katz*, 533 U.S. 194 (2001)).  Finally, if the right was clearly established, the court determines whether the plaintiff has alleged

8

sufficient facts and supported his allegations with sufficient evidence to indicated that
what the official did was unreasonable in light of the clearly established constitutional
right. *Toms,* 338 F.3d at 524.

Determining whether the force used to make a particular seizure is reasonable
under the Fourth Amendment "requires a careful balancing of the nature and quality of
the intrusion on the individual's Fourth Amendment interests against the countervailing
governmental interests." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "Courts must
apply an objective standard, looking to 'the facts and circumstances of each particular
case, including [1] the severity of the crime at issue, [2] whether the suspect pose[d] an
immediate threat to the safety of the officers or others, and [3] whether he was actively
resisting arrest or attempting to evade arrest by flight.'" *Gaddis v. Redford Township*,
364 F.3d 763, 772 (6th Cir. 2004) (quoting *Graham*, 490 U.S. at 396). Further,
evidence related to the severity of a plaintiff's injuries may be relevant in determining
the amount of force used. *Martin v. Heideman*, 106 F.3d 1308, 1311-12 (6th Cir. 1997)
(the Supreme Court's reference to the "nature and quality of the intrusion" in *Graham*
must include consideration of the severity of any injury inflicted).

Courts assess the reasonableness of an officer's conduct from the perspective of
a reasonable officer on the scene, not *ex post* with the benefit of 20/20 hindsight.
*Graham*, 490 U.S. at 396. The court's reasonableness calculus allows "for the fact that
police officers are often forced to make split-second judgments--in circumstances that
are tense, uncertain, and rapidly evolving--about the amount of force that is necessary
in a particular situation." *Graham*, 490 U.S. at 397. The right to make a lawful seizure
"carries with it the right to use some degree of physical coercion or threat thereof to

9

effect it." *Id.* at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Id.* Totally gratuitous uses of force, however, may be excessive. *Gaddis,* 364 F.3d at 772 (citing *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988)). In addition, the subjective intentions of the officer involved are not relevant to whether the force used was reasonable. *Graham*, 490 U.S. at 397.

Defendants argue that Plaintiff has failed to demonstrate that excessive force was used and assert that "[t]heir response was in fact not only reasonable but necessary to counter and stop the actions of [Plaintiff]. [Plaintiff] ha[d] two outstanding warrants, one of the deputies had learned of [his] history of assaultive behavior, and Defendant Overby felt threatened by [Plaintiff's] actions." (Defs.' Mot. at 12.) Defendants point to the Oakland County Sheriff's Office Policy which authorized the use of Tasers in certain circumstances. The policy states in relevant part:

> Personnel may use an approved Taser when:
> they are required to use physical force to take a person into custody,
> to protect himself or herself from physical assault,
> to protect a subject from injuring himself/herself or others, and
> against animals who pose a serious threat towards the deputy or others.

(Oakland County Sheriff's Office Policies and Procedures, Defs.' Mot. at Ex. J.)

Defendants also point to Defendant Overby's deposition testimony in which he stated:

> Q: "Personnel may use and approve TASER when" and "A" is they are
> required to use physical force to take a person into custody, and is it - -
> was it your assessment here that you needed to use that TASER in order
> to take Mr. Wylie into custody?
> A: Yes, I needed that.
>
> Q: And it was not "B" to protect yourself from physical assault in this situation?
> A: It was - it included that too.

10

Q: Well, at the time you TASERed him, did you believe Mr. Wylie was a threat to you physically?
A: Yes.  He body slammed me.

Q: Did it appear to you as though he was making another effort at that point to physically assault you?
A: Yes.  He was trying to escape.

Q: Wait a minute.  You said he was trying to escape.  Is that the same to you as trying to physically assault you?
A: Sure.

Q: Alright.
A: If I'm blocking his route.

Q: At that point were you blocking his route, at the point you TASERed him?
A: At the time I TASERed him, no.

Q: And "C" is to protect a subject from injuring himself, herself, or other.  Did you think he was a threat to himself?
A: Yes.

(Overby Dep. at 99-100.)

At the threshold of the analysis of this issue is whether Plaintiff's guilty plea to a charge of resisting arrest and assaulting an officer in state court precludes him from arguing that he did not resist the officers' attempt to arrest him.  The answer is that it does.  *Heck v. Humphrey*, 512 U.S. 477 (1994) is dispositive of that question:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.  A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Id*. at 486-87; *see also Cummings v. City of Akron,* 418 F.3d 676, 682 -683 (6th Cir. 2005) (holding that *Heck* barred an excessive force claim where "[t]he struggle between

11

Cummings and the officers gave rise to both Cummings' assault conviction and the excessive force claim, and the two [were] inextricably intertwined.  Additionally, Cummings could have raised excessive force as a defense to the assault charge, but instead he chose not to contest the charge."); *see also Sandul v. Larion*, No. 94-1233, 1995 WL 216919, at *6 (6th Cir. April 11, 1995) (holding that the plaintiff could not dispute the fact that he had threatened an officer for purposes of a § 1983 claim because he had pleaded no contest to the charge of "attempted" felonious assault under Michigan law); *see also Wilkins et al. v. The City of Royal Oak et al.*, No. 04-73276, at *18, *21 (E.D. Mich. August 17, 2005) (holding that the plaintiffs' no contest pleas to assault and battery precluded them from denying the facts underlying the conviction).

Here, Plaintiff's plea was more specific than the potentially equivocal "no contest" noted in the cases just mentioned, as it was an unqualified "guilty."[7]  Plaintiff thus admitted that he had assaulted an officer and that he had resisted an attempted arrest. Plaintiff's guilty plea precludes him from now denying the facts underlying the plea - i.e. that Plaintiff, in fact, assaulted the officer(s) and resisted arrest - for purposes of his § 1983 excessive-force claim.  To allow Plaintiff to now argue facts to the contrary, i.e., that he did not commit an assault or try to resist his arrest, would violate the principles of *Heck*.  *See Wilkins,* No. 04-73276, at *18, *21.

There is no argument that Plaintiff's conviction has been invalidated or its validity otherwise called into question.  Accordingly, the pre-guilty plea police investigation

---

[7] This is not to imply that a no contest plea would not have the same preclusive effect. *See Sandul*, supra.

12

reports in this record, describing the facts underlying Plaintiff's guilty plea, are taken as true.  These facts, stated in these reports, demonstrate clearly that Plaintiff was trying to escape capture for the pre-existing arrest warrants, and actively resisting the officers' efforts to subdue him.  (*See* Defs.' Mot. at Exs. D, Police Report #116843 and F, Police Report #116902.)  Based on this indisputable evidence, the court can conclude only that Plaintiff had committed assault and was resisting arrest.

The foregoing conclusion, however, may not fully resolve the question of excessive force, as "[a] conviction for resisting arrest does not preclude a § 1983 claim for excessive force."  *Donovan v. Thames,* 105 F.3d 291, 296 (6th Cir. 1997).  *But see Cummings*, 418 F.3d at 682 ("[S]uccess on Cummings' excessive force claim would necessarily imply the invalidity of his state assault conviction.").  The court will therefore examine the question of whether the officers used more than an reasonable degree of force in their use of Tasers.

"A 'taser' is an electronic device used to subdue violent or aggressive individuals.  By pressing a lever, a high voltage electrical current is transmitted through a wire to the target."  *Nicholson v. Kent County Sheriff's Dept.*, 839 F.Supp. 508, 515, n.4 (W.D. Mich. 1993).  As a practical matter, Taser darts are "designed to stun a combative suspect."  *Koon v. United States,* 518 U.S. 81, 86 (1996); *Russo v. City of Cincinnati* 953 F.2d 1036, 1048 (6th Cir. 1992) ("It is clear that the taser was designed to be used in this type of circumstance: to stun and to disable temporarily rather than to inflict more serious or more permanent injury.")

In resolving Eighth Amendment punishment issues, the Sixth Circuit has commented upon the wide use of Taser devices, holding that "[g]iven the number of

13

cases which have upheld the use of stun guns[8] or chemical agents against recalcitrant prisoners, we cannot say that it was clearly established that the use of a stun gun . . . was a per se violation of the Eighth Amendment."  *Caldwell v. Moore*, 968 F.2d 595, 600 (6th Cir. 1992). Within the circumstances of this Fourth Amendment case, Plaintiff having twice broken from the officer's grasp and continuing his attempt to escape, a reasonable officer could well have chosen to use escalated, non-lethal force.  The only non-lethal choices known to the court not involving a firearm are 1) physically subduing Plaintiff by engaging him (e.g., striking with fists or tackling), 2) striking him with a weapon such as a baton, 3) using a chemical agent such as pepper spray or 4) applying an electronic device such as a Taser.

The use of personal force carries with it some risk of injury to the officer himself, and requires that the officer get close enough to the subject to apply the force.  The use instrumental force, by striking with a baton or something similar, implicates the same requirement of proximity, and carries with it some risk of serious injury to the subject, such as broken bones.[9]  To use a chemical spray also requires the officer to get fairly

---

[8] The term "stun gun" is often used interchangeably with the electrical control device called the "Taser" (which is in fact a brand name, *see* <http://www.taser.com/>). There may, however, be differences. The term "stun gun" may sometimes refer to an electrical device requiring direct contact rather than expelling darts, *see* <http://www.stingersystems.com/ultron.htm>, describing the "Ultron II" contact stun gun. "Stun gun" also may sometimes mean a firearm designed to expel a beanbag filled with lead shot and meant to stun rather than to injure.  *See Michenfelder v. Sumner*, 624 F.Supp. 457, 460 (D. Nev. 1985) (discussing "stun guns" that were deemed ineffective in a certain prisoner control situation "because the inmate can shield himself from the bean bag that is expelled by such a gun.")

[9]"The baton . . . can be used as an offensive or defensive weapon. . . .  The baton should be used only in an emergency, and when blows are struck, it should be with the intention of stunning or temporarily disabling, rather than inflicting injury.  Blows

14

close to the subject and carries some risk of the spray hitting and incapacitating an

officer.[10]  There is little risk of lasting harm to the subject, although pain is felt until the

substance is flushed away.[11]  The proper use of a Taser requires neither close proximity

nor carries any serious risk of lasting injury to the subject.  *Nicholson,* 839 F.Supp. at

515, n.4.  In some instances, officers (and courts) may find it appropriate to use all of

these forms of force in the course of making an arrest.  *See, e.g., Cummings ,* 418 F.3d

at 679-680 (officers "struck [resisting subject] with their fists and batons, and sprayed

him with pepper spray.  A third officer arrived on the scene, and used a Taser gun . . .,

[the subject] was finally subdued, handcuffed, and taken into police custody.")

        The court finds that under the circumstances in this case, a decision to use the

Taser device did not cross the "hazy border between excessive and acceptable force."

*Saucier*, 533 U.S. at 206 (quoting *Priester v. Riviera Beach*, 208 F.3d 919, 926-27 (11th

--------------------------------

to the head should be avoided. The baton used as an extension of the arm is generally
more effective than when used as a bludgeon, or club." *Morgan v. Rhodes,* 456 F.2d
608, 617 (6th Cir. 1972) (quoting *Prevention and Control of Mobs and Riots,* Federal
Bureau of Investigation, U.S. Dept. of Justice, J. Edgar Hoover, 89-91 (1967)). *See
also United States v. Koon*, 833 F. Supp. 769, 781 (C.D. Cal. 1993) (citing testimony of
biomechanics expert "that the side-handle baton can deliver sufficient force to cause
loss of consciousness and significant localized damage of facial bones").

[10]*See, e.g.*, *State v. Bothwell*, No. 03-0421, 2003 WL 22900543, *1 (Iowa Ct.
App. December 10, 2003) (an officer's treatment for over-spray inhalation of pepper
spray potentially a basis sufficient to support a defendant's guilty plea to "causing"
bodily injury to the officer).

[11]  "OC is a derivative of hot cayenne peppers and is the newest defensive spray
agent. It is not an irritant like the tear gases, but an inflammatory agent. Contact with
mucous membranes (eyes, nose, throat and lungs) will cause immediate dilation of the
capillaries of the eyes, resulting in temporary blindness and instant inflammation of the
breathing tube tissues, cutting off all but life-support breathing. OC does not deteriorate
with age and unlike the tear gasses, does not cause lasting aftereffects." *Atkins v.
Township of Flint,* 94 Fed.Appx. 342, 346, n. 3 (6th Cir. 2004).

15

Cir. 2000)).  Defendants' use of force, in the form applied here, was reasonably needed to subdue a person who had assaulted them and resisted their efforts to arrest him. *Graham*, 490 U.S. at 396; *see also Devoe v. Rebant*, 2006 WL 334297, *7 (E.D.Mich. February 13, 2006) (finding that the officer's use of  Taser was objectively reasonable under the circumstances and thus did not constitute excessive force) (citing *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (the officer's use of Taser to effectuate the plaintiff's arrest "was reasonably proportionate to the difficult, tense and uncertain situation that [the officer] faced in this traffic stop, and did not constitute excessive force.")  *See also Vinyard v. Wilson,* 311 F.3d 1340, 1348 (11th Cir. 2002) ("Courts have consistently concluded that using pepper spray is reasonable . . . where the plaintiff was either resisting arrest or refusing police requests, such as requests to enter a patrol car. . . .").

Plaintiff, in his deposition, described a purported decision to surrender in the midst of his attempt to break away and flee.  He says that he turned to the officers and raised his hands to shoulder height.  He asserts that the officers should have known that the fight was over.  Plaintiff's point, however, is incompatible with what both parties concede comprised a *rapidly occurring series of acts* that did not occur discretely, event by separate event, but rather in an undifferentiated continuum.  Even accepting Plaintiff's deposition version of his behavior (which Defendants contest), he describes no unmistakable "break in the action" that a reasonable officer *must* have recognized as a surrender.  It is entirely clear to this court that, from the perspective of a reasonable objective officer, an assaultive subject trying to escape who suddenly turns and raises his hands to shoulder height could as easily be assuming an aggressive posture in

16

preparation for fighting as trying to indicate a surrender.  The most Plaintiff could argue at trial is that he had changed his mind about escaping.  He cannot reasonably argue that any officer who saw him in action *must* be held to have known what he was thinking.

Plaintiff's assaultive acts in resisting arrest and his attempt to evade arrest by flight are important factors that locate Defendants' use of the Taser well within the realm of reasonable use of force.  *Gaddis*, 364 F.3d at 772.  Plaintiff's injuries, sustained as an understandable consequence of the decision to deploy the Tasers, do not change – nor even substantially inform – the court's analysis in this case. *Martin*, 106 F.3d at 311-12. There is no indication in this record of pain being inflicted gratuitously, i.e., independently of the need to apprehend Plaintiff.  Plaintiff was hit in the top of his head only because he was beginning to bend over either as a result of a Taser shock being deployed by the first officer's unit, or a result of trying to avoid it. No other sensible explanation has been proffered that could explain landing a Taser dart on top of a person's head, even if, as here, the officer were appreciably taller than the subject.[12]

Even taking as true Plaintiff's testimony about starting to "give up" in the heat of the few tense and uncertain seconds in which these events occurred, the court nonetheless concludes that no reasonable officer would be expected to read Plaintiff's

_____

[12] The court recalls, but rejects as unrealistic, Plaintiff's suggestion at oral argument that one of the officers involved in this case, being larger than Plaintiff, should be, in essence, required to chose a physical attack on Plaintiff, chasing and tackling him in lieu of using a device such as a Taser to subdue him.  The court believes that Tasers and similar devices were developed in part to protect police officers - and citizens – from the dangers of hand-to-hand combat and from escalated, lethal force.  A man being placed under arrest must be considered potentially dangerous even if smaller than the arresting officer, as Goliath cannot be guaranteed unscathed victory.

17

mind and instantly know that what had theretofore been Plaintiff's attitude of insolence, struggle and flight had suddenly become cooperation, surrender and peace... based only upon Plaintiff turning and beginning to raise his hands.

Analysis of qualified immunity presupposes the existence of a constitutional violation. Where a plaintiff fails to prove the existence of an underlying violation, the court need not address immunity. *See, e.g., Houston v. Clark County Sheriff Deputy,* 174 F.3d 809, 815 (6th Cir.1999).

### B.  Assault and Battery

Defendants also seek summary judgment on Plaintiff's state law claims.  Under Michigan law, an assault is defined as "any intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact."  *Espinoza v. Thomas*, 472 N.W.2d 16, 21 (Mich. Ct. App. 1991).  A battery is the "wilful and harmful or offensive touching of another person which results from an act intended to cause such a contact."  *Id*. at 21.

Governmental actions which would normally constitute intentional torts are protected by governmental immunity if those actions are justified.  Conversely, if the actions are not justified, they are not protected by governmental immunity.  *Brewer v. Perrin*, 349 N.W.2d 198, 202 (Mich. Ct. App. 1984).  In order to support a claim for assault and battery, the amount of force used must have been unlawful because a police officer may use reasonable force when making an arrest.  *Id*.; *Delude v. Raasakka*, 215 N.W.2d 685, 688 (Mich. 1974); *People v. Krum*, 132 N.W.2d 69, 72

18

(Mich. 1965).  "'The measure of necessary force is that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary.'"  *Brewer,* 349 N.W.2d at 202.

In evaluating a claim of unreasonable force, the court notes that "police officers are employed to work in a 'milieu of criminal activity where every decision is fraught with uncertainty.'"  *White v. Beasley*, 552 N.W.2d 1, 5 (Mich. 1996) (quoting *Ezell v. Cockrell*, 902 S.W.2d 394, 398 (Tenn. 1995).  In addition, "a police officer making a lawful arrest may use that force that is reasonable in self-defense circumstances and is not required to retreat before a display of force by the adversary."  *Alexander v. Riccinto*, 481 N.W.2d 6, 8 (Mich. Ct. App. 1991).  Nonetheless, "the officer must have a reasonable belief of great danger before responding with the appropriate amount of force to foreclose the threat."  *Id*.

Defendants argue that "the evidence does not support a conclusion that Deputy Overby or Deputy Houck used more force than was 'reasonably necessary' under the facts and circumstances existing at the time, i.e. that there were two outstanding warrants for Plaintiff's arrest, that Plaintiff resisted the deputies' efforts to arrest him, and that Plaintiff attempted to flee."  (Defs.' Mot. at 16.)  For the reasons stated above, there is no issue of fact as to whether Plaintiff was in fact resisting the arrest, and thus no question whether Defendants acted reasonably in their attempt to effectuate the arrest. Even viewing the facts in a light most favorable to Plaintiff, a reasonable jury could determine only that Defendants did not employ excessive force against Plaintiff in order to subdue him.  Therefore, the court will grant Defendants' motion on Plaintiff's assault and battery count as well.

19

## IV.  CONCLUSION

IT IS ORDERED that Defendants' "Motion to Dismiss or For Summary Judgment"

[Dkt. # 22] is GRANTED.

           S/Robert H. Cleland
           ROBERT H. CLELAND
           UNITED STATES DISTRICT JUDGE

Dated:  April 14, 2006

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, April 14, 2006, by electronic and/or ordinary mail.

           S/Lisa Wagner
           Case Manager and Deputy Clerk
           (313) 234-5522